CITY BANK OF HOUSTON v. FIRST NATIONAL BANK OF HOUSTON.

1. RAISED CHECK—WARRANTY—INDORSEMENT.—The indorsement of a raised check is in effect a representation and warranty to the drawee that it is genuine, upon which he may rely, in making payment, secure in being reimbursed by the indorser after discovery of the fraud.

2. RAISED CHECK—MISTAKE.—The payment of a raised check to an indorser thereof through mistake, may be recovered back by the paying bank to the extent of the difference between the original check and the amount to which it is raised, if there be no other feature in the transaction to work an estoppel. The indorsement is substantially a warranty on the part of the indorser that there is no mistake in the amount.

3. MISTAKE—NEGLIGENCE.—The general rule is that money paid under a mistake of fact may be recovered back, and this although the party paying may have had the means of knowledge.

4. SAME.—Mere negligence in making a mistake in the payment of money is not sufficient to preclude the party making it from demanding its correction. Such negligence does not give to the party receiving payment the right to retain what is not his due, unless he has been misled or prejudiced by the mistake. This rule does not apply where the mistake occurs in not detecting the forged signature of a correspondent of the drawee.

5. NEGLIGENCE.—As against one who passes a raised bill or check, and especially in favor of a drawee who pays to such a party on the faith of his indorsement, and in so doing violates no obligation or duty, *reasonable diligence in demanding repayment is all that can be required*; and when that is exercised and no damage has resulted from the delay, the right of recovery is not lost.

APPEAL from Harris.     Tried below before the Hon. James Masterson.

This suit was brought by the First National Bank of Houston against the appellant, to recover the sum of $1,980 alleged to have been paid through mistake to the latter on an altered check originally drawn for $20 and altered to $2,000.

The plaintiff and appellee, a banking association, alleged that on the 19th day of February, A. D. 1872, the Texas Banking and Insurance Company of Galveston issued the following check, drawn on the plaintiff, viz:

"$20.     *The Texas Banking and Insurance Company.*

GALVESTON, *Feb.* 19, 1872.

Pay to the order of D. J. Wallace, in current funds, twenty dollars.

To First National Bank,          ALPHONSE LAUVE,
  No. 364.   Houston.                 *Cashier.*"

That said check or draft was, after its issuance, fraudulently altered, so that it read as follows, viz:

"$2,000.     *The Texas Banking and Insurance ·Company.*

GALVESTON, *Feb.* 17, 1872.

Pay to the order of D. J. Wallace, in current funds, two thousand dollars.

To First National Bank,          ALPHONSE LAUVE,
  No. 364.   Houston.                 *Cashier.*"

That said check was ·presented to the plaintiff on the 6th day of March, 1872, by the City Bank of Houston, and plaintiff being deceived by the alteration, the check was paid as a check for $2,000.

The application of C. R. Johns & Co., bankers, of Austin, who purchased the check in its altered form from Wallace, to be admitted as defendants, was refused by the court, and they intervened.

The City Bank of Houston, by amended answer, denied that payment of the check was induced by its indorsement, and charged that its indorsement was not made until after it had been submitted to the plaintiff and pronounced by it to be "good." That the First National Bank, by thus virtually accepting and giving credit to the check, induced the City Bank to indorse the same, and to charge the plaintiff and credit their correspondents, C. R. Johns & Co., with the sum of $2,000 on their books; that the First National Bank was concluded and estopped by its acceptance of the check, by its laches, and long silence after payment thereof, and by its negligence in not sooner informing the City Bank of the alleged forgery, from recovering in this action.

Defendants also pleaded that at the time of the payment of the check, the drawee had notice from the drawer that no such check had been drawn; and though the check was paid on the 6th of March, 1872, no notice of the erroneous payment was given by the First National Bank until April 9, more than a month after its payment.

The evidence disclosed that on the 19th day of February, A. D. 1872, the Texas Banking and Insurance Company of Galveston drew its check, No. 364, on the First National Bank of Houston, payable to the order of D. J. Wallace, for $20. That check was afterwards altered as to its date, which was changed to February 17, and as to amount, which was changed to $2,000, the number (364) identifying the check, remaining unchanged. Being thus altered, it was first presented by a man calling himself D. J. Wallace, about the last of February, at the counter of the First National Bank, but was not paid, because there was no sufficient identification of the holder. It was presented by a man claiming to be D. J. Wallace, at the banking house of C. R. Johns & Co., at Austin. To them Wallace was identified by Mr. Blackman, a person believed to be responsible, and well known to C. R. Johns & Co. After his identification, Wallace indorsed the check, and C. R. Johns & Co. purchased it as a check for $2,000; and Wallace was heard from no more.

It was the custom of the Texas Banking and Insurance Company of Galveston and the First National Bank of Houston to render each to the other, between the 1st and 3d of each month, an account current, embracing the transactions between them for the month preceding. In pursuance of this custom, the drawer of the altered check forwarded, between the 1st and 3d of March, 1872, its account current to the First National Bank of Houston, designating the check as " Check No. 364, for $20." After its receipt, the book-keeper of the First National Bank had entered up on the books of that bank check No. 364 as an outstanding check of the drawer for twenty dollars, before the same was presented

and paid, on the 6th of March, A. D. 1872, as a check for two thousand dollars.

C. R. Johns & Co., after purchasing the check, forwarded it at once to their correspondents, the City Bank of Houston, to be entered by them to their credit when paid. It was presented by the defendant to the First National Bank on the morning of March 6, 1872, for recognition, and was there pronounced by the drawee " good." After being thus recognized by the drawee in the morning, and pronounced " good," it was indorsed by the City Bank of Houston, and in the evening of the same day paid to appellant, and C. R. Johns & Co. credited by the City Bank with two thousand dollars. The teller of the First National Bank testified that " when a draft comes up to us from the City Bank for our recognition, it is not indorsed until our recognition is obtained; they would be foolish to indorse the paper without our recognition." Other points of evidence will be found referred to in the opinion. Verdict and judgment for appellees. The instructions, the giving of which was assigned as error, will be found in the opinion.

*Terrell & Walker*, for appellant.—When the check was presented to the First National Bank for recognition by an innocent party about to indorse it, the teller saw that it bore date February 17, 1872; he then knew (as every officer of the bank did) that the drawer of the check had rendered his account current for the month in which it was drawn, and had designated it (if it was a genuine check) by its number and amount. It is not pretended that this fact was forgotten. Here was a source of information known to no one but the drawer and the First National Bank of Houston. Why was such a source of information, then in their pockets, which would in an instant disclose the fraud, not explored, when the City Bank, then about to buy the check—an innocent party—applied to the appellee for information?

Messrs. Redfield & Bigelow, in their leading cases on Bills of Exchange and Promissory Notes, page 746, say:

"By the law-merchant of this country, the certificate of the bank that a check is 'good,' is equivalent to acceptance. It implies that the check is drawn on sufficient funds in the hands of the drawee, and that they have been set apart for its satisfaction, and that they shall be so applied whenever the check is presented for payment. It is an undertaking that the check is good then and shall continue good; and this agreement is as binding on the bank as its notes of circulation, a certificate of deposit payable to the order of the depositor, or any other obligation it can assume. The object of certifying a check, as regards both parties, is to enable the holder to use it as money. The transferee takes it with the same readiness and sense of security that he would take the notes of the bank. It is available also to him for all the purposes of money. Thus it continues to perform its important functions, until, in the course of business, it goes back to the bank for redemption, and is extinguished in payment."

Such has been held to be the law everywhere outside of New York, except in one case. The first innovation upon a doctrine so reasonable and just was made in New York, in Bank of Commerce v. Union Bank, 3 Comst., 230; and Redfield and Bigelow, in the edition of their work just quoted from, issued in 1871, twice dissented from the doctrine announced in that case. (Pp. 62, 662.) True, Mr. Bigelow recently, in his work on estoppel, indicates a change of opinion, which is neither instructive nor interesting when made in opposition to so much authority.

In addition to the other authorities opposed to Bank of Commerce v. Union Bank, we cite Byles on Bills, 323; Ward v. Allen, 2 Met., 53, (decided in 1840;) Langton v. Lazarus, 5 Mees. & W., 629, in which it was held that a fraudulent alteration of the day of payment, made before acceptance, is no defense to the acceptor in an action by a *bona fide* holder.

Whatever is notice enough to excite the attention of a

man of ordinary prudence, and call for further inquiry, is in equity notice of all facts to the knowledge of which an inquiry suggested by such notice, and prosecuted with due and reasonable diligence, would have led. (Gallatin *v.* Erwin, 1 Hopk., 48; Roberts *v.* Anderson, 3ª Johns. Ch., 371; Pitney *v.* Leonard, 1 Paige, 461; Bingerman *v.* Hyatt, 1 Smedes & Marsh., 437; Peters *v.* Goodrich, 3 Conn., 146.) If a man has actual notice of circumstances sufficient to put a man of ordinary prudence on inquiry as to the particular point, the knowledge of which he might, by the exercise of reasonable diligence, have obtained, such knowledge will be imputed to him by a court of equity. (Kerr on Frauds, 236; Davis *v.* Bigler, 62 Penn., 242; Hinds *v.* Vattier, 1 McLean, 110; Cotton *v.* Hart, 1 A. K. Marsh, 56.) Now, if it did not have actual knowledge that the check was raised, then of what circumstances did the First National Bank have actual notice, which should have put a prudent man on inquiry at the time it pronounced the check good? They are as follows:

1. It knew—for the teller swears it—that the same check had only a few days before been presented and had been refused payment.

2. It knew that it was dated in February, and was presented in March.

3. It knew that the account current for the month in which it was drawn had been received from the drawer since the date of the check, and that it would disclose whether they were safe in pronouncing it "good."

4. It knew that after refusing to pay it in the hands of a holder, it had been carried two hundred miles in the interior, and sold.

5. It knew that appellant was making an inquiry of the payee, on the result of which would depend its indorsement, and, to use the language of plaintiff's teller, (Drew,) "they would be foolish to indorse it until it had been pronounced 'good.'"

Now, are not these circumstances, of which the appellee

had actual notice, sufficient to charge it with constructive notice of the fraud? And yet the jury was virtually excluded by the charge from their consideration. Their force will be readily understood when it is remembered that the appellee was mysteriously silent with regard to any actual recollection of the check when it was presented for its inspection in the morning, and contented itself with pronouncing it good; but in the evening, when it had induced the appellant to indorse it, Drew, the teller, remarked, "I see that gentleman got his money; I suppose it is all right;" thus disclosing an actual recollection of the paper itself, and that he had before refused to pay it. This incident is suggestive when we remember the jealousy between rival banks doing business in the same city.

The principle of the doctrine of constructive notice is, that when a person is about to do a thing by which he has reason to believe that the rights of a third party may be affected, an inquiry into the fact is a moral duty, and diligence an act of justice.

Mr. Kerr, in his work on Frauds, says: "Wilful ignorance is not to be distinguished in its equitable consequences from actual knowledge. * * A man who abstains from inquiry when inquiry ought to have been made, cannot be heard to say so and rely on his ignorance." (Pp. 237, 238; Oliver *v.* Piatt, 3 How., 333; Jenkins *v.* Eldredge, 3 Story, 181; Pitney *v.* Leonard, 1 Paige, 461.)

The National Bank of Commerce *v.* The National Mechanics' Banking Association, N. Y., not reported, which approves Kelly *v.* Solari, and Kingston Bank *v.* Eltinge, 40 N. Y., 391, is, we respectfully submit, opposed to the weight of authority in much that it decides, and is, to our minds, in some respects repugnant to justice and sound policy. We refer especially to its approbation of the doctrine in Kingston Bank *v.* Eltinge, 40 N. Y., 391, which holds that care and diligence are not controlling elements in the case. Even on this point it is confused and contradictory, for, after approving the case

just referred to, they say: "Whether the plaintiff had failed to exercise such care and diligence as amounted to negligence were facts to be determined by the jury." (Opinion, p. 8.)

Opposed to its reasoning, we earnestly invite the attention of the court to the following authorities, viz: Price *v.* Neil, 3 Burr, 1357; Bank of United States *v.* Bank of Georgia, 10 Wheat., 343; Gloucester Bank *v.* Bank of Salem, 17 Mass., 33; Baas *v.* Updegrove, 5 Barr, (Penn.) 518; Irving Bank *v.* Wetherald, 36 N. Y., 335; Levy *v.* Bank of United States, 4 Dall., 234; Cocks *v.* Masterman, 9 Barn. & Cress., 902; Jordan *v.* Money, 5 H. L. Cases, 212 (per Ld. Ch. Cranworth); 1 Story's Eq. Ju., sec. 191; Lanier *v.* Hall, 25 Ala., 545; Drake *v.* Foster, 28 Ala., 650; Plant *v.* Vaegelin, 30 Ala., 160; Smith *v.* Mercer, 6 Taunton, 76.)

"When a bank seeks to recover from the payee, it is held rigorously to make the discovery of the forgery, and to give notice of it with great promptitude. It is also at the least a very strong point, and probably an absolutely essential one, that in the interval between the presentment and payment and the notification to the payee, he should have been deprived of no legal rights, and should have lost no practical opportunity, or even chance, of saving himself on the paper." (Morse on Banking, 299, edition of 1870; see also Wilkinson *v.* Johnson, 3 Barn. & Cress., 428; Cocks *v.* Masterman, 9 Barn. & Cress., 902; Smith *v.* Chester, 1 Durnf. & E., 655; see also dissenting opinion of Ruggles, J., in Goddard *v.* Merchants' Bank, 4 Comst., 147.)

Again, it has been settled by a large train of authorities that a party's ignorance of the truth of the representation made will not remove the estoppel, if his ignorance is the result of gross negligence. (Calhoun *v.* Richardson, 30 Conn., 210; Preston *v.* Mann, 25 Conn., 118; Slein *v.* Croucher, 1 DeG., F. & I., 518; Smith *v.* Newton, 38 Ill., 230; Hoxey *v.* Home Ins. Co., 32 Conn., 21; Beardsley *v.* Foot, 14 Ohio Stat., 414; Odlin *v.* Grove, 41 N. H., 461.)

*George Goldthwaite,* for appellee, filed an exhaustive and able brief, contending for the application of the doctrine that money paid under a mistake of facts may be recovered back, citing Chit. on Cont., sec. 626; Chit. on Bills, sec. 425; 2 Smith's Lead. Cases, sec. 237; Mowatt *v.* Wright, 1 Wend., 355; Burr *v.* Veeder, 3 Wend., 412; Waite *v.* Legett, 8 Cowen, 195; Union Bank *v.* United States Branch Bank, 3 Mass., 74; Garland *v.* Salem Bank, 9 Mass., 408; Lazell *v.* Miller, 15 Mass., 207; Kerr on Fraud and Mistake, 415, and cases there cited; 2 Pars. on Notes and Bills, 597.

He relied especially on the English case of Kelly *v.* Solari, 9 Mees. & Well., 54, and contended that appellant ought not in conscience to retain the money, because it did not belong to the City Bank, and for the further reason that the City Bank and Johns & Co. had each, on the same principle, their remedy over against the party to whom they respectively paid the money, back to the original wrongdoer.

Much reliance was also placed on the case of Canal Bank *v.* The Bank of Albany, 1 Hill, 287, 292, 293, in support of which he cited 2 Pars. on Bills and Notes, pp. 80, 482, 549, 590, 599, 601; Morse on Banks and Banking, 295, 300; also Bigelow on Estoppel, 435, correcting a criticism on this case in Redfield & Bigelow's Leading Cases, pp. 62, 662; 1 Pars. on Cont., 264; Chit. on Cont., last ed., 928; Story on Bills of Exchange, 4th ed., sec. 264.

He also relied much on the cases of Espy, Heidelbach & Co. *v.* Bank of Cincinnati, 18 Wall., 604, and Marine Bank *v.* National City Bank, 59 N. Y., 67, and 55 Barb., 87.

GOULD, ASSOCIATE JUSTICE.—This suit was brought by the First National Bank of Houston, to recover of the City Bank of Houston the sum of $1,980, alleged to have been paid by mistake. A brief history of the transaction will be necessary.

On February 19, 1872, the Texas Banking and Insurance Company of Galveston issued to a stranger, claiming the name of D. J. Wallace, the following check:

"$20.        THE TEXAS BANKING AND INSURANCE COMPANY,
                        GALVESTON, *Feb.* 19, 1872.
  Pay to the order of D. J. Wallace, in current funds, twenty
dollars.                .                ALPHONSE LAUVE, *Cashier.*
        No. 364.
*To First National Bank, Houston.*"

After its issuance this check was fraudulently altered, so as
to read as follows:

"$2,000.        THE TEXAS BANKING AND INSURANCE COMPANY,
                        GALVESTON, *Feb.* 17, 1872.
  Pay to the order of D J. Wallace, in current funds, two
thousand dollars.                ALPHONSE LAUVE, *Cashier.*
        No. 364.                .
*To First National Bank, Houston.*"

In this altered condition the check was, on February 25 or
26, presented to plaintiff; but the party presenting failed to
identify himself satisfactorily as the payee Wallace, and pay-
ment was refused.  At the time, Wallace was accompanied
by Mr. Gray, assistant teller of the City Bank, who said:
"This is Mr. Wallace, or a man of that name, who keeps an
account with us; that is, under that name."  This was deemed
insufficient; and Gray, refusing to indorse for him, payment
was refused.

On or about March 4 the altered check was purchased by
C. R. Johns & Co., a banking firm at Austin, Texas, of a
party who was introduced to them by a person known to
them as D. J. Wallace, and who in that name indorsed to
them the check.  They indorsed it to their correspondents
and agents, the City Bank of Houston for the purpose of
collection.

On the morning of March 6 the check thus indorsed was
presented by the City Bank to the National Bank, and was
by the latter pronounced good; and on the evening of that
day, in accordance with the custom of these banks, the City
Bank indorsed the check and received credit for the amount

as so much cash. When the check was pronounced good, the City Bank gave Johns & Co. credit for the amount, and notified them of the fact.

It was the custom of the Texas Banking and Insurance Company and the First National Bank of Houston to transmit to each other, between the 1st and 3d of each month, an account current, showing the transactions between them for the preceding month. This account for February had been transmitted and received by the First National Bank, and entered up by its book-keeper before the presentation of the check on March 6, and showed check No. 364 to be for $20 and of date February 19, and of course did not show any check corresponding to the one paid.

The check was examined at this time by the officials of both banks, who detected no evidences of its having been altered.

On the 3d day of April, on the interchange of accounts for the month of March, the alteration of the check was discovered, or at least was suspected; and, after inquiry of and hearing from the drawer, was made known at once to the defendant. The facts seem only to have been fully ascertained some days afterwards, after a trip by the president of the National Bank to Galveston, made for the purpose, and formal demand for the return of the money was not made until April 9.

The defenses set up were: That the plaintiffs had notice that no such check had been drawn on them at the time of the payment; that the check, prior to any indorsement by defendants, had been submitted to the plaintiffs and pronounced by them to be good, thereby virtually accepting the same; and that, upon the faith of that acceptance, defendants indorsed said check and credited their correspondents with the amount thereof; that, by the negligence of the plaintiffs in failing to inform defendants that the check was raised, all remedy against Wallace had been lost; and that by this negligence and by its acceptance plaintiffs were estopped.

It was also alleged that the drawers of the check had been guilty of negligence in failing to use a perforating instrument then used by bankers.

The evidence developed the facts already stated. There was no evidence that the interchange of monthly accounts was adopted for the purpose of detecting forgeries or alterations, or that there was any custom of bankers to refer to such accounts before paying the checks of their correspondents, though one witness says, as a matter of prudence, he could do so. On the other hand, there was evidence that such a use of these accounts by the paying teller would be unusual, and that they were used for the purpose of correcting errors, striking balances, and seeing that books agree. The book-keeper examined them, compared them with the books, and reported to the cashier. The same book-keeper entered up each night the checks paid that day. The book-keeper who entered up the payment of $2,000 on check No. 364, on the night of March 6, had already examined the account current, which showed that check to be for $20, but testifies that he did not detect the discrepancy until the next monthly account was received.

The evidence showed that it was customary to collect checks between the banks by presenting them in the morning for recognition; and if they were pronounced good or all right, they were considered as paid. The transaction was consummated on the afternoon of the same day, when the checks were indorsed and treated as so much cash.

Everitt, a member of the firm of C. R. Johns & Co., testified that they were first advised of the check being raised, by letter from the cashier of the City Bank, on April 11th; that he at once commenced search for Wallace, but did not find him. Had he been promptly advised of the forgery, thinks he could have overtaken or found Wallace. If he had been telegraphed ahead twenty-four hours, don't think Wallace could have got out of the State without his catching him. Considers his recovery from Wallace entirely lost. There

is no other evidence whatever as to damage resulting from
the delay to discover and give notice of the forgery, unless
it be the statement of the cashier of Johns & Co. that he paid
Wallace ten thousand dollars for the check; that Wallace
was introduced by a person whom he believed responsible.
Thought they would have recourse on him, but did not know
that the money could be made out of him.

It does not appear to be seriously contended that the Texas
Banking and Insurance Company was guilty of any negligence
in the manner of drawing the genuine check No. 364,
though there is some evidence in regard to the utility of a
perforating instrument in preventing the successful alteration
of checks.

So much of the charge of the court as is material is as
follows:

"2. If you believe from the evidence that the check in
evidence was, without negligence in the manner of its drawing,
drawn by the Texas Banking and Insurance Company of
Galveston, in favor of D. J. Wallace, for twenty dollars, ($20 ;)
was, after it came to the possession of Wallace, raised by him
so as to make it a check for two thousand dollars, ($2,000 ;)
and after such material alteration, sold and indorsed it to
C. R. Johns & Co., for value, and without notice to Johns & Co.
of such alteration; and if Johns & Co. sent it through their
correspondents, the City Bank of Houston, who, in due and
usual course of dealings, collected same from the First Na-
tional Bank of Houston, and passed the same up to the credit
of Johns & Co. on the books of the City Bank; if you further
believe from the evidence that within a reasonable time after
discovery of the alteration the First National Bank notified
the City Bank of such alteration,—find for the plaintiff $1,980
and eight per cent. per annum interest thereon from date of
notice to the City Bank against City Bank, and find over in
favor of City Bank against Johns & Co.

"3. If satisfied from the evidence that when plaintiff paid
the check it knew that the same had been altered and raised,

then it cannot recover—you to ascertain from all the evidence whether in fact plaintiff, when it paid to the City Bank the $2,000, knew of the forgery.

"4. If from the evidence you are not satisfied that there was any alteration in the check after its delivery. to the drawer, find for defendant.

"5. If the indorser took the check from the payee after its alteration, in a material respect from a stranger, without inquiry, although in good faith, for value, and gave it currency and credit by indorsing it before receiving payment of it, the drawee may recover back the money paid."

The defendant, amongst other instructions, asked the following, which were refused:

"3. When one of two innocent parties must suffer, he must sustain the loss who has been most negligent; and if in this case you find that either one of the parties to the suit has contributed more than the others, by negligence or failing to use the information in his possession, to delay the exposure of the forgery, you will find a verdict against that party.

"7. If the plaintiff had notice at the time of paying the check that its correspondent's check for that number was for but twenty dollars, it is no excuse for the plaintiff that its officers had forgotten or failed to look at the information at the time of paying the check. Notice to the bank is binding upon the bank, no matter how the duties of its subordinate agents may be arranged.

"8. If the First National Bank of Houston was advised on the day (or before) of the payment of the check that their correspondent's check for that number was a twenty-dollar, and not a two-thousand-dollar check, and neither the defendant nor intervenors had such notice, then the plaintiff cannot excuse itself in delaying for more than a month to advise the holder of the forgery; and such delay is negligence which entitles the defendant to recover.

"9. If you believe from the evidence that the defendant, before indorsing the check, had the same presented to the

plaintiff for recognition and credit, and was induced by the declarations of plaintiff that the check was good to credit C. R. Johns & Co. with the face of the check, and to indorse the name of the defendant on the check before payment to defendant, then the plaintiff is estopped from now recovering the amount from defendant, and you will find for defendant.

"10. That if you believe that the plaintiff, at the time of paying said check, had information from the drawer of the same that the check having the number of the one described in the petition was but for twenty dollars originally, and defendants obtained the check in good faith and had no such information, then plaintiff cannot recover, and you will find for the defendant."

It should be remarked that Johns & Co. intervened in the case and assisted in the defense. There was a verdict and judgment for the plaintiff, from which the defendant appeals, the errors assigned and urged being in the charge of the court as given, and the refusal of the charges asked.

Under the evidence, we think that the plaintiff was entitled to recover, and that there is no error in the instructions given or refused requiring a reversal of the cause.

The indorsement of the check by Johns & Co. and by defendant amounted to a representation and warranty that it was genuine. (2 Pars. on Notes and Bills, 589, and ref.)

The plaintiff might well rely on this responsibility of defendant, and make payment when demanded, secure in being reimbursed if the check should prove to have been raised. (Morse on Banks, 310; Ellis & Martin *v.* Ohio Life and Trust Company, 4 Ohio, 628.)

The payment being made under a mistake, and to a party who substantially contracted that there was no such mistake, the bank, being under no such obligation and not being otherwise estopped, is entitled to recover the money.

The general rule is that money, paid under a mistake of fact, may be recovered back, and that, too, although the party may have had the means of knowledge. (1 Story on

Cont., secs. 410, 422, and ref.; Kelly v. Solari, 9 Mees. & Well., 54; Waite v. Leggett, 8 Conn., 195; Bell v. Gardiner, 4 Mann. & Grang., 11; see also Kerr on Fraud and Mis., 415, and ref.)

In the recent case of National Bank of Commerce v. National Mechanics' Banking Association, (— New York Court of Appeals, 1874,) the court say: "On general principles, mere negligence in making the mistake is not sufficient to preclude the party making it from demanding its correction. Such negligence does not give to the party receiving the payment the right to retain what was not his due, unless he has been misled or prejudiced by the mistake. If the loss had been incurred and become complete before the payment, he should not, in justice, be permitted to avail himself of the mistake of the other party to shift the loss upon the latter."

In this case it is evident that the loss had been incurred by Johns & Co. when they purchased the raised check from an irresponsible party. The subsequent mistake of the plaintiff, in paying this altered check to the defendant, the agent of Johns & Co., should not serve to shift the loss, unless defendant or Johns & Co. have been damaged in some way by the laches of plaintiff, or unless there is some rule of law prohibiting the latter from setting up the mistake.

If the forgery had been in the signature of its correspondent, it is well settled that there is a rule of law forbidding the bank from setting up such a mistake. (Morse on Banks, 295, and ref.; Price v. Neil, 3 Burr, 1355; Bank of United States v. Bank of Georgia, 10 Wheat., 333.)

In such a case the mistake is covered by a failure on the part of the bank to fulfill its acknowledged duty; that is, to know the signature of its correspondent or customer. (Id.)

But it is now also settled that this rule does not apply to altered or raised checks, as to which the acceptor or drawer is not presumed to be better able than the indorser to detect the alteration. (Bank of Commerce v. Union Bank of New York, 3 Comst., 230; Espy, Heidelbach & Co. v. First Na-

tional Bank of Cincinnati, 18 Wall., 604; National Park Bank *v.* Ninth National Bank, 55 Barb., 87.)

If, then, the plaintiff is estopped in this case, it is not because of any rule peculiar to the mercantile law, but because the facts bring the case within the general principles of estoppel. It is true that there are early authorities which hold a party paying a forged draft to great diligence in giving notice. The modern doctrine is believed to be that, as against one who passes a raised bill or check, and especially in favor of a drawee who pays to such a party on the faith of his indorsement, and in so doing violated no obligation or duty, reasonable diligence is all that can be required; and where that is exercised, and no damage has resulted from the delay, the right to recover is not lost. (2 Pars. on Notes and Bills, 598, and ref.; National Bank of Commerce *v.* Mechanics' Bank N. Y., 18 Wall., *supra;* 3 Comst., *supra.*)

In this case there is no evidence which would support a verdict to the effect that the delay in detecting and giving notice of the forgery after March 6th has deprived defendant, or Johns & Co., of any remedy, or has in anywise injured either of them. It is not shown that Wallace remained in Austin, or in reach of Johns & Co., for a single day after the sale on the fourth. The opinion of Everitt that he could have overtaken him, if he had received notice, in twenty-four hours, is not evidence which would support a verdict of damage.

Because, then, there was no evidence of damage to defendant or Johns & Co. from the alleged negligence and delay of plaintiff, the refusal of the court to give the instructions asked becomes immaterial.

Under the evidence it satisfactorily appears that the presentation of the check for recognition as good was not for acceptance, but was really a mode of payment, adopted for the convenience of the banks. The payment was consummated on the settlement of the day's transactions. Certainly there was no evidence to justify the charge asked on that sub-

ject, because there is nothing to indicate that the presentation, if not for payment, was intended or understood to be for any other purpose than to be informed as to the signature of the drawer and the state of his account. (18 Wallace, *supra.*) Because we find no error, the judgment is affirmed.

AFFIRMED.