**CUNNINGHAM v. FRITO CO.**

No. 11645.

Court of Civil Appeals of Texas.
San Antonio.

Dec. 11, 1946.

Rehearing Denied Jan. 15, 1947.

Brewer, Matthews, Nowlin & Macfarlane and John F. Sutton, Jr., all of San Antonio, for appellant.

Johnson & Rogers, of San Antonio, and Jack Johannes, of Dallas, for appellee.

NORVELL, Justice.

This is an appeal from a temporary injunction. Ordinarily, on an appeal of this nature, the issue is whether or not the trial judge abused his discretion in granting the injunction. Harding v. W. L. Pearson & Co., Tex.Com.App., 48 S.W.2d 964. However, in this case, the basis of the injunction is a covenant contained in a written contract between the parties, which contract is, in our opinion, "absolutely void and not enforceable either in law or equity," by reason of the anti-trust laws of this State. Acts 1903, 28th Leg., ch. 94, p. 119, Articles 7426, 7427, 7428, 7429, 7437, Vernon's Ann.Civ.Stats.

This holding is based upon the terms of a contract dated January 19, 1940, which recites that appellee, The Frito Company, is engaged in the business of manufacturing and selling "Fritos," a corn chip product, "Fritatos," potato chips, and "Frito Frys," salted peanuts—products which have been well advertised throughout the State of Texas; that appellant, Fred A. Cunningham, is desirous of selling said Fritos, Fritatos and Frito Frys, within a territory designated upon a map attached to the contract, embracing the down-town business section of San Antonio, Texas; that upon the sales routes within said territory, Fritos, Fritatos and Frito Frys have been sold for a long period of time; that appellant has asked permission of The Frito Company to make purchases of its products at jobbing or wholesale prices for the purpose of re-selling same within the designated territory and elsewhere.

The contract further provides that:

"In Consideration of the granting by the First Party (The Frito Company) to the Second Party (Cunningham) of the right to make or to continue to make purchases of Fritos, Fritatos and Frito Frys at such jobbing prices as The Frito Company may from time to time designate, and the further agreement on the part of the Frito Company to continue to sell the Second Party Fritos, Fritatos and Frito Frys at the regular wholesale or jobbing prices for a period of thirty days from the date of the execution of this agreement, the parties covenant and agree as follows:

"The First Party agrees, as related above, not to terminate the right of the Second Party to purchase Fritos, Fritatos and Frito Frys for a period of thirty days from the date of the signing of this agreement, provided, however, that the First Party shall have the right at any time to refuse to sell the Second Party Fritos, Fritatos, or Frito Frys, if the Second Party has been dishonest in his actions with the First Party or with any other person, firm or corporation, or has incurred debts which are past due and refuses to pay his accounts in full when called upon by the creditor or creditors, and further, if the Second Party is incompetent or fails to put forth his best efforts to sell Fritos, Fritatos and Frito Frys upon the route herein specified, or if the Second Party is indebted to First Party in an amount in excess of his bond.

"It is further agreed by and between the parties that the Second Party shall be an independent contractor and that his movements upon the route herein specified shall not be controlled or directed by the First Party; that he may carry and sell such other products upon said route, or elsewhere, as he chooses and that he may call upon the customers in said territory upon any dates and at any time he so desires, and that management and control is not and will not be exercised by the First Party.

"The parties mutually agree that this contract may be terminated without notice at any time after the expiration of the thirty days set forth above, during which time The Frito Company may not terminate said contract without due cause, as set forth herein. The proper termination of this agreement will not affect the restrictive covenants of this contract, however."

Under the restrictive covenant of the contract, which is expressly referred to as a "covenant against competition", it is pro-

774

vided that for a period of three years from and after the termination of the contract appellant, Cunningham, will not "engage in the business of selling or distributing potato chips, corn chips or salted peanuts" in competition with The Frito Company within the territory designated by the contract, which, as above pointed out, embraces the downtown business area of San Antonio.

It is undisputed that the contract of January 19, 1940, has been terminated and that prior to the granting of the temporary injunction appellant was engaged in selling potato chips, corn chips and salted peanuts within the area described in the contract, and within the three year period following the termination of the contract between the parties.

Although the contract, in one of its clauses, provides that appellant may "sell such other products upon said route, or elsewhere, as he chooses" it is apparent that at any time after thirty days from January 19, 1940, the restrictive covenant against competition could be invoked by The Frito Company by revoking the principal contract, which provided that said contract "may be terminated without notice at any time after the expiration of the thirty day period set forth." In fact, the record shows that the contract was terminated by The Frito Company because Cunningham had sold potato chips of his own manufacture upon the route or within the territory described in the contract.

Appellee's theory of the case is illustrated by the following excerpt from its brief: "The contract shows upon its face that the Appellee had an established business on the route in question and an established good will. It sought by the terms of the contract to protect this business and its established good will. This being true, *it is not important whether the Appellant was an independent contractor or whether he was a mere employee;* the principles of law are the same." (Italics ours.)

We are unable to agree with appellee's argument. In our opinion the authorities cited by it, such as Bettinger v. Fort Worth Ice Co., Tex.Civ.App., 278 S.W. 466, and similar cases, are not applicable to this appeal.

From the specific wording of the contract, two things are obvious. First, both The Frito Company and Cunningham occupy the position of principals. The term "independent contractor" is used in describing Cunningham's legal relationship to The Frito Company. The contract relates to the sale of merchandise. The Frito Company is the seller and Cunningham is the buyer. The contract does not make Cunningham the agent or the employee of The Frito Company. It is not an agency contract. Second, the restrictive covenant of the contract (relied upon to support the injunction) which is expressly designated as a "covenant against competition," is squarely in the teeth of the statute which denounces combinations of capital, skill or acts by two or more persons, firms or corporations for the purpose of preventing or lessening competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities. Art. 7426, § 3, Vernon's Ann.Civ.Stats.

This appeal, as we see it, is controlled by authorities such as Texas Brewing Co. v. Templeman, 90 Tex. 277, 38 S.W. 27, and Fuqua v. Pabst Brewing Co., 90 Tex. 298, 38 S.W. 29, 750, 35 L.R.A. 241. In the cited cases, the issue was whether or not the contracts involved were violative of the anti-trust laws. The determining factor of this issue was whether the contracts were agency or employment contracts, or contracts of sale between principals. In the Texas Brewing Co. case, Chief Justice Gaines, speaking for the Supreme Court, said:

"The contract, unlike that construed by this court in the case of the [Milburn] Manufacturing Co. v. Peak, 89 Tex. 209, 34 S.W. 102, is in its essence a contract for the sale of beer and ice by the brewing company to Norwood & Co., and does not, like the latter, establish a mere agency. The brewing company is to furnish the beer and ice at certain stipulated prices, and Norwood and Co. are 'to pay for the merchandise sold them with acceptances with each and every invoice.' Upon the delivery of the beer and ice the title passed, and the brewing company was absolutely entitled to the price, with its right secured by the bond of the defendants in error. If

there was any doubt upon this point, it is set at rest by the original petition in the case. The plaintiff shows, by its allegations, that it sues to recover the price of goods sold.

"The contract of the principals was clearly prohibited by the Act of March 30, 1889 (which is very similar in wording to the Act of 1903), * * *. The contract, we think, is a combination of capital, skill, and acts. As a basis for the transactions which were to be effected in pursuance of its provisions, the brewing company agreed to supply a storage vault and a wagon, which were to remain its property, and Norwood & Co. agreed to furnish a suitable place, free of rent, for the erection of the vault, and to use their best endeavors in the interest of the brewing company—that is to say, to do all reasonably within their power to promote the sale of the beer. Here is a union of the capital of both parties and a union of the skill of one of them. The contract itself and what was done under it are acts of combination. Was the combination unlawful? By the agreement the Brewing Company bound itself to give to Norwood & Co. the sole representation and sale of its products in and near the town of Navasota, *and the latter placed themselves under the reciprocal obligation to sell no other beer than that of the company.* The effect of the contract is evidently to create and 'carry out restrictions in trade,' and 'to prevent competition' in the 'sale and purchase' of 'commodities,' namely, beer and ice. Clearly the act in question forbids such agreements. The statute denounces penalties for the violation of its provisions and expressly declares 'that any contract or agreement in violation of the provisions of this act shall be absolutely void and not enforceable either in law or equity.' " (Italics ours.)

■ While the hiring of employees and the selection of agents may be described as an incident of trade, the buying and selling of commodities is trade itself. Some distinctions in legal effect between an agency contract and a contract of sale are pointed out in Texas Jurisprudence, viz.: "Where there is created a mere agency to sell goods, the giving of exclusive territory for selling, at the prices fixed by the principal, is not a violation of the anti-trust law. In such case there is no union or association of otherwise independent, separate and possibly competing 'capital, skill, or acts,' and hence **no** combination. The seller, as owner of the goods, may determine to whom he will sell and at what price; he has the same right when distributing his goods through an agent as if he were making the sales himself. Of course the mere fact that a contract is designated as an agency or consignment agreement, when in reality it is an outright sale, does not relieve it of its illegal character." 29 Tex.Jur. 766, § 17.

■ While the text above quoted mentions only "exclusive territory for selling, at the prices fixed by the principal," it is stated in Corpus Juris, that: "Contracts for the sale of goods, which assume to obligate the purchaser not to sell the goods of any other manufacturer than his vendor, are void under the Federal Anti-Trust Act [15 U.S.C.A. §§ 1–7, 15 note] and under the Clayton Act [38 Stat. 730], where the contract 'may substantially lessen competition or tend to create a monopoly.' A contract of this character has generally been held void under the state anti-trust acts; but there is contrary authority." 41 C.J. 145, § 131.

As authority for the rule stated with reference to state anti-trust acts are the following Texas cases, all of which support the text, viz.: Fuqua v. Pabst Brewing Co., 90 Tex. 298, 38 S.W. 29, 35 L.R.A. 241; Columbia Carriage Co. v. Hatch, 19 Tex.Civ.App. 120, 47 S.W. 288; W. T. Rawleigh Medical Co. v. Gunn, Tex.Civ.App., 186 S.W. 385; W. T. Rawleigh Medical Co. v. Fitzpatrick, Tex.Civ.App., 184 S.W. 549; Armstrong v. W. T. Rawleigh Medical Company, Tex.Civ.App., 178 S.W. 582; J. R. Watkins Medical Co. v. Johnson, Tex.Civ.App., 162 S.W. 394. See also, American Brewing Ass'n v. Woods, Tex.Com.App., 215 S.W. 448. No Texas case is cited as "contrary authority."

The only possible distinction that can be urged between the cases cited and the

one at hand is that in the cases mentioned, the restrictive agreement not to compete was sought to be made operative during the period of time the parties were engaged in buying and selling. Here the appellee seeks to enforce the restrictive covenant against competition *after* the parties have ceased to do business with each other. If the restrictive agreement · be obnoxious to the statute while buying and selling between the parties is taking place, it can hardly be contended that said restriction is not obnoxious to the statute after the parties have ceased to do business together. It is still a contract to prevent or lessen competition.

The judgment appealed from is reversed and the injunction vacated. Reversed and rendered.