**PRAM LABORATORIES, INC., Appellant,**

v.

**PRAM LABORATORIES–SOUTH, INC., et al., Appellees.**

No. 17318.

Court of Civil Appeals of Texas.

Dallas.

Sept. 29, 1969.

Kiel Boone, Kilgore & Kilgore, Dallas, for appellant.

Jack N. Price, Price, Fisher, Hill & Patton, Longview, for appellees.

DIXON, Chief Justice.

This is an appeal from a summary judgment.

Appellant Pram Laboratories, Inc., hereinafter called Pram, brought this suit against appellee Pram Laboratories-South, Inc., hereinafter called Pram-South, and against appellee Mrs. Mary Collins Mims individually on verified account in the amount of $35,360.83. Pram also asks judgment for $682.42 for money mistakenly sent to Pram-South by companies which Pram claims are indebted to it.

Pram is incorporated under the laws of the State of Pennsylvania with its principal office and manufacturing plant in that state. Pram-South is incorporated under the laws of the State of Alabama and has done business in both that state and in the State of Texas, in which latter state it has a permit to do business and has maintained an office at all times material hereto. Mrs. Mary Collins Mims is the President of Pram-South.

On the same day that this suit was filed Pram caused a writ of attachment to issue and the Sheriff of Dallas County took into his possession "approximately 250 cartons (various sizes) of Pram Toner, Film remover, absorbent and others, of the approximate value of $22,015.50 * * *." This property is now being held by a Special Bailee. The Sheriff also attached several pieces of office furniture and fixtures which are being held by Mrs. Mims as Special Bailee.

Appellees Pram-South and Mrs. Mims filed a motion for summary judgment which was sustained and judgment accordingly rendered that appellant take nothing against appellees.

Mrs. Mary Collins Mims, President of Pram-South, was formerly an employee of Pram in Pennsylvania. She left the company and went to Alabama pursuant to a contract whereby she became a distributor of Pram products in Alabama. After Pram-South was organized as a corporation Mrs. Mims assigned her distributorship rights to the corporation. She soon thereafter moved to Texas, where she now resides and is in charge of the office and operations of Pram-South.

The record before us contains copies of two contracts: one dated May 1, 1966 between Pram and Mrs. Mims (assigned to Pram-South) covering a distributorship for Alabama; and one dated July 22, 1966 with Pram-South covering a distributorship for Texas. The two contracts are substantially alike in all their material terms and provisions except that one contract pertains only to the distribution and sale of Pram products in Alabama, while the other pertains only to Texas.

The itemized account attached to appellant's pleadings is lengthy and includes a list of all sales in both Alabama and Texas beginning April 26, 1966 and extending to June 28, 1968. Mrs. Mary Collins Mims submitted an affidavit to which is attached a statement of account and exhibits showing that total charges amounted to $47,726.-53. Against said total charges payments in the amount of $12,401.70 are shown to have been made and credited by Pram, leaving a balance of charges unpaid in the amount of $35,360.83. This is the exact amount sued for by Pram in its amended petition.

Mrs. Mims testified in her deposition that all the charges for merchandise sold and delivered to Pram-South in Alabama have been paid. Pram does not contradict Mrs. Mims' statement.

A few years ago R. W. Williams, now President of Pram, developed a product called a toner for use in Xerox copying machines. He at first had a company called Patent Research and Marketing Company. In 1965 he organized Pram. The word

Pram is a coined word whose letters are the first letters in the first four words of Patent Research and Marketing Company. The principal kind of toner is a dry ink. For some time Xerox Corporation had a virtual monopoly in the manufacture and sale of toner for use on Xerox machines. But in recent years several companies, including Pram, have developed a toner which may be used on Xerox machines. The sales field is now competitive.

The main defense pleaded by Pram-South is that the written distributorship contract entered into between Pram and Pram-South pursuant to which the merchandise here involved was sold and delivered[1] is violative of Articles 7426 et seq., Vernon's Ann. Civ.St., the anti-trust laws of the State of Texas, and is therefore void and unenforceable. 38 Tex.Jur.2d 799–800.[2]

Mrs. Mims claims that she individually is not a party to the contract and did not

1. The provisions of the contract material to this controversy are as follows:

"DISTRIBUTORSHIP AGREEMENT * * * BETWEEN PRAM LABORATORIES INC., a Pennsylvania corporation having its place of business at #1 Carpenter Lane, Irwin, Pa., * * * AND PRAM LABORATORIES-SOUTH, INC., an Alabama Corporation * * *. IT IS AGREED BY AND BETWEEN THE PARTIES HERETO AS FOLLOWS:

1. Distributor herein named for the sum of Fifteen Thousand Dollars ($15,-000.00) paid to *PRAM is hereby appointed exclusive distributor of PRAM'S products, to service all customers in the territory consisting of the state of Texas,* such sum representing Seven Thousand Five Hundred Dollars ($7,500.00) to cover PRAM'S expense for technical assistance, sales training and service as designated by PRAM, and Seven Thousand Five Hundred Dollars ($7,500.00) for inventory.

* * * * *

3. *Distributor,* at its own expense, *agrees* as follows: *To sell and deliver only in the exclusive territory so assigned;* to maintain an office, telephone, and inventory storage space; to devote such time and effort, as necessary and proper, to promote and sell PRAM'S products; to service consumers; to purchase and keep on hand an adequate stock of merchandise to supply customers; to pay for products from PRAM as required and to handle any complaints of consumers; *not to represent or sell any competitive lines;* to cooperate with any advertising or sales promotion program established by PRAM; to comply with the policies and rules and regulations of PRAM; and to protect its good will, name and rights; and to notify PRAM of any complaints or other incidents regarding the use, sale or distribution of the product in question.

4. PRAM agrees as follows: To sell Distributor Pram Copy Toner and re-

lated products on the terms established by *its applicable price sheet in effect at the time of the order, F.O.B. PRAM'S point of shipment, net 30 days, 2%—10 days cash discount. PRAM may at any time and from time to time, alter the terms of sale, including the right to sell on a secured interest basis. * * * All advertising and sales promotion material issued by Distributor is subject to prior approval of PRAM.*

* * * * *

10. *Upon termination, Distributor shall not* sell any of PRAM'S products and shall not, for a period of one year thereafter, *sell any competitive products.* Distributor shall return any advertising and sales material and cease the use of any trademarks, trade names or service marks granted to Distributor by PRAM.

11. Upon termination of this Agreement, PRAM will accept and pay for, at PRAM'S place of receipt, any products then owned by Distributor at the then prevailing prices or prices Distributor paid for products, if lower, for any of PRAM'S products then on hand and unsold and new and in saleable condition. All freight charges are Distributor's obligations and prepaid by Distributor.

12. *Distributor is not an agent or employee of PRAM for any purpose, but an independent contractor.* * * *

13. Distributor reserves the right to terminate this Agreement at any time upon the giving of sixty (60) days written notice, and by assuming a 10% handling charge, based on Distributor's book value of inventory at the time of termination.

14. This Agreement shall be interpreted under the laws of the Commonwealth of Pennsylvania." (All emphases are ours.)

2. Articles 7426, et seq., have been repealed but the same statutes have been brought forward in substance in the Business and Commerce Code, §§ 15.01, et seq. See § 15.04(b) of the code.

in her individual capacity order or accept delivery of any of the merchandise in question. In the alternative she also pleads violation of the anti-trust statutes.

## OPINION

Appellees contend that there are three features of the contract which are directly contrary to the public policy of the State of Texas as expressed in the Texas Constitution and Articles 7426, et seq., V.A. C.S., as recodified in § 15.01, et seq., Texas Business and Commerce Code. These three features are as follows:

1. The contract appoints Pram-South the exclusive distributor of Pram's products within the State of Texas.

2. The contract binds Pram-South not to represent or sell any competitive lines.

3. The contract specifically reserved to Pram the right to set the terms and the retail prices of the products sold to consumers by Pram-South which price fixing agreement was carried out and insisted on by Pram.

Pram also claims that regardless of whether the contract itself by its terms provided for Pram to fix the retail prices in Texas, the parties pursued a course of conduct by which Pram was able to control the retail price of its products in Texas. Ford Motor Co. v. State, 142 Tex. 5, 175 S.W.2d 230, 233 (1943).

Appellant Pram bases its appeal on fourteen points of error: (1) the exclusive distributorship under the contracts does not violate the Texas anti-trust statutes; (2) the noncompetitive provisions do not violate the statutes; (3) because said noncompetitive provisions are permitted to protect the name and reputation of Pram; (4) and to protect Pram's trademark; (5) a manufacturer owning a federally registered trademark has the right to restrict distributors to a territory, noncompetitive sales and price; (6) the application of Texas anti-trust statutes in this case actually destroys competition contrary to the purpose of the statutes; (7) the application of said statutes constitutes an unwarranted burden on interstate commerce in violation of the Constitution of the United States; (8) there is a fact issue as to whether appellees ignored and repudiated the noncompetitive provisions of the contracts and therefore are estopped to claim said noncompetitive provisions as defenses; (9) there is a fact issue as to whether Pram fixed prices at which Pram-South distributed or sold; (10) the parties contractually selected and chose to be bound by the laws of the State of Pennsylvania, which contain no such prohibitions as the Texas statutes; (11) Articles 7426, et seq., V.A.C.S., were repealed by the Legislature more than nine months before the filing of this lawsuit; (12) the record reflects the individual commitment of Mary Collins Mims to one of the contracts involved and her promise to pay for certain merchandise purchased; (13) Pram is entitled to recover the merchandise attached irrespective of the application of the Texas anti-trust statutes; and (14) Pram is admittedly entitled to $682 collected by appellees from third parties due and owing to Pram unrelated to any contract or claim of appellees.

It is undisputed that Pram-South is not an agent or employee of Pram. The contract itself so stipulates. It explicitly states that Pram-South is an independent contractor. The transactions on which Pram bases its suit were sales of merchandise. Title passed from Pram to Pram-South upon delivery in Texas. Consequently Pram's attempt to restrict the rights of Pram-South in the subsequent retail sale of the merchandise in Texas brings the contract and transactions under it within the application of our state anti-trust laws.

The contract undertakes to grant to Pram-South an exclusive distributorship (that is, the exclusive right to sell Pram products) "in the territory consisting of the State of Texas." This is violative of our anti-trust statutes. Climatic Air Distributors of South Texas v. Climatic Air Sales, Inc., 162 Tex. 237, 345 S.W.2d 702 (1961).

In support of its holding our Supreme Court cites Patrizi v. McAninch, 153 Tex. 389, 269 S.W.2d 343 (1954); Grand Prize Distributing Co. of San Antonio v. Gulf Brewing Co., 267 S.W.2d 906 (Tex.Civ. App., San Antonio 1954, writ ref'd); American Brewing Ass'n v. Woods, 215 S.W. 448, 450 (Tex.Com.App., 1919); Anheuser-Busch Brewing Ass'n v. Houck, 88 Tex. 184, 30 S.W. 869, 870 (1895). See also Albin v. Isotron Corporation, 421 S.W. 2d 739, 743 (Tex.Civ.App., Texarkana 1967, writ ref'd n. r. e.) and cases there cited.

■ The contract binds Pram-South "not to represent or sell any competitive lines." This too is violative of our anti-trust statutes. Cunningham v. Frito Co., 198 S.W.2d 772 (Tex.Civ.App., San Antonio 1947, no writ); Kelly v. Bryson Pipeline & Refining Co., 163 S.W.2d 413 (Tex. Civ.App., Fort Worth 1942, no writ); Henderson Tire & Rubber Co. v. Roberts, 12 S.W.2d 154 (Tex.Com.App., 1929); Heid Bros. v. Riesto, 281 S.W. 638 (Tex.Civ.App., El Paso 1926, writ dism'd); Dickerson v. McConnon & Co., 248 S.W. 1084 (Tex.Civ. App., Beaumont 1923, no writ); W. T. Rawleigh Co. v. Lemon, 247 S.W. 683 (Tex.Civ.App., Amarillo 1923); W. T. Rawleigh Medical Co. v. Gunn, 186 S.W. 385 (Tex.Civ.App., El Paso 1916).

■ Appellees contend that paragraph 4 of the Texas contract attempts to give Pram authority to fix the retail prices at which Pram's toner and related products may be sold by Pram-South in Texas. We do not agree. Paragraph 4 plainly pertains only to the prices at which Pram will sell its products to Pram-South. It does not attempt to dictate the prices at which Pram-South may sell the products to its customers in Texas.

■ But appellees further say that, regardless of the terms of the contract, Pram did in fact fix the retail prices for Texas and that Pram-South complied. It is true that Pram had a committee which studied market conditions over the nation and had its own ideas of retail prices at which its products might well be sold. But there is testimony that the conclusions of the committee were only advisory—in other words recommendations, not orders or directives. Suggested prices are not violative of anti-trust statutes.

Moreover the record contains an affidavit of Ray Miller, formerly sales manager of Pram-South. He stated that the routine practice was to offer Pram toner at a competitive price set by Pram-South, that no prices were dictated by Pram, and that prices at which Pram toner was sold by Pram-South varied from $23 to $40 per carton. The record shows a fact question in regard to retail price fixing.

The record before us discloses that Pram-South received payments of money from General Electric Company of Oklahoma City, Oklahoma; Courtaulds North America, Inc. of Mobile, Alabama; Levitz Furniture Company of Dallas, Texas; Kellwood Company of Little Rock, Arkansas; and Mallory Capacitor Company of Huntsville, Alabama. Mrs. Mims admits that none of the above companies owed Pram-South any debts at the time the money was received. The money was sent to Pram-South through mistake.

In a supplemental petition filed February 6, 1969 Pram alleges that Pram-South "has collected from Plaintiff's customers an acknowledged total of $682.42." For the first time Pram asked judgment against Pram-South for the several amounts which make the total sum of $682.42.

■ The trial court correctly denied recovery for the $682.42. None of the companies who mistakenly made the several payments to Pram-South is a party to this suit. In no instance is there a statement or admission from any of said companies that the money paid was or is owed to Pram or a direction that it be paid over to Pram. This phase of Pram's suit has nothing to do with the anti-trust statutes of the State of Texas.

There is no legal relationship or cause of action between Pram and Pram-South be-

**538**

cause of the inadvertent payments of such money to Pram-South by the companies who mistakenly sent the money to Pram-South. If the money was mistakenly sent, the companies who sent it are entitled to have it sent back to them.

■ It has been held many times that under circumstances such as these money paid through mistake, even unilateral mistake, may be recovered by the payer. And this is true though the mistake was made as a result of ignorance, forgetfulness, or negligence on the part of the payer. Central National Bank of Houston v. Martin Mortgage Co., 396 S.W.2d 218, 222 (Tex.Civ. App., Houston 1965, writ dism'd); Hull et al. v. Freedman et al., 383 S.W.2d 236, 239 (Tex.Civ.App., Fort Worth 1964, writ ref'd n. r. e.); First-Wichita National Bank v. Steed, 374 S.W.2d 932 (Tex.Civ.App., Fort Worth 1964, no writ); Capital National Bank in Austin v. Wootton, 369 S.W.2d 475 (Tex.Civ.App., Austin 1963, writ dism'd); Davis v. Gonzales, 235 S.W.2d 221 (Tex. Civ.App., Fort Worth 1950, writ dism'd); Prigmore v. Hardware Mutual Ins. Co., 225 S.W.2d 897 (Tex.Civ.App., Amarillo 1949, no writ); Ward v. Tadlock, 183 S.W.2d 739 (Tex.Civ.App., Fort Worth 1944, no writ); Witherspoon v. Cory, 250 S.W. 199 (Tex.Civ.App., San Antonio 1923, no writ); Alston & Hutchings v. Richardson, 51 Tex. 1 (1879); City Bank v. First National Bank, 45 Tex. 203 (1876); 44 Tex. Jur.2d 750.

Whether the companies who made the payments do in fact owe debts to Pram are questions which cannot be adjudicated in this case under the present state of the record.

■ All of Pram's points of error are overruled except point No. 9. Though we have held in sustaining point No. 9 that there is a fact question in regard to the charges of retail price fixing we cannot reverse this judgment on that ground; for we have also held that the contract in other particulars does violate our anti-trust statutes. By its express terms the contract vio-lates our statutes in regard to the exclusive distributorship provisions and in regard to the provisions binding Pram-South not to sell or represent any competitive lines. Therefore the contract is unenforceable. Faced with such a situation the law will leave the parties in the position in which it finds them. Art. 7437, V.A.C.S. and § 15.04(b), Business and Commerce Code.

The judgment of the trial court is affirmed.