AMERICAN BREWING ASS'N v. WOODS.
(No. 97–2923.)

(Commission of Appeals of Texas, Section B.
Nov. 5, 1919.)

1. SALES ⊘═7—CONTRACT CONSTRUED AS ONE
OF SALE, NOT AGENCY.

An agreement whereby a brewing company
gave plaintiff the exclusive right to sell its
beer within fixed territory, but which required
plaintiff to purchase and pay for the beer in-
dividually, *held* not an ordinary contract of
agency, but one of sale.

2. MONOPOLIES ⊘═17(2), 21 — CONTRACT A
COMBINATION IN RESTRAINT OF TRADE AND
INVALID.

A contract whereby a brewing company, in
consideration of plaintiff's payment of a debt
owing to it, agreed to give plaintiff the exclusive
right to sell its beer in a county, plaintiff to pay
a fixed price and to order the beer as he re-
quired it, being a contract of sale, and not of
agency, falls within Rev. St. 1911, art. 7798, de-
claring that, where any two or more persons
who are engaged in buying or selling enter
into an agreement or understanding to refuse
to buy from, or sell to, any other person, such
agreement shall constitute a conspiracy in re-
straint of trade and be invalid, and hence an
action for breach of such agreement cannot be
maintained.

Error to Court of Civil Appeals of Ninth
Supreme Judicial District.

Action by W. C. Woods against the Ameri-
can Brewing Association. A judgment for
defendant was reversed, and the cause re-
manded by the Court of Civil Appeals (183
S. W. 127), and defendant brings error.
Judgment of Court of Civil Appeals revers-
ed, and that of trial court affirmed.

T. J. Adams, of Amarillo, and Fisher,
Campbell & Amerman, of Houston, for plain-
tiff in error.

Holland & Holland, of Orange, for defend-
ant in error.

MONTGOMERY, P. J. This suit was insti-
tuted by W. C. Woods to recover damages on
account of breach of a verbal contract enter-
ed into by the parties about March 28, 1908.
The trial court gave the jury a peremptory
charge to find for the defendant. Upon ap-
peal, the judgment was reversed, and the
cause remanded for a new trial. 183 S. W.
127.

The trial court held that the contract as
alleged and proved was illegal, and within
the inhibition of article 7798 of the Revised
Statutes. The Court of Civil Appeals held
that the contract as alleged and proved did
not violate the provisions of the statute
above referred to. In this case we think it
sufficient, in order to determine the question
involved, without reference to the pleading,
to set out the testimony of the plaintiff, W. C.

Woods, as to the terms of the agreement. We
will here reproduce that part of his testimo-
ny relating to the agreement:

"I am acquainted with the American Brew-
ing Association. About January 1, 1911, they
were engaged in the business of making and
brewing beer at Houston, Tex. They were at
that time doing business at Orange through
an agent, and were selling beer that they had
manufactured. I was their agent here at one
time, and Capt. Boland was their agent before
me. This company has been doing business in
Orange in that way for about 12 or 14 years.
Their manner of doing business was: They
would bill the shipment to the agent, and the
agent would sell it to the saloons, and that is the
way they sold it through Capt. Boland. There
was a certain price that they sold it to Capt.
Boland for, and then he would sell it for more
than that. * * * The American Brewing As-
sociation did not sell through any other agency
here. As to whether or not 'at that time I
knew Capt. Boland was indebted to them, I
will say he was indebted to them about $2,400.
I made an agreement with reference to the
agency and the payment of this indebtedness.
I agreed that, if they would turn the agency
over to me, I would pay them the $2,400 that
Boland owed them. They were to give me the
entire agency that Capt. Boland had. He
had the agency of American Brewing Associ-
ation. * * * I was to get the beer, and sell
it to the saloon men, and then collect for it.
The agreement was to last as long as they
had an agency here, and I was to pay them
the $2,400 that Boland owed them, and I did
pay them that amount. They shipped me
beer according to that agreement for five or
six years, I guess, on this same agreement.
* * * I was selling the Schlitz bottle beer
at that time to the saloons at Orange. I
had been selling Schlitz beer about nine years
before I made the agreement with the American
Brewing Association. I had been selling beer
at that time about eight years, and was en-
gaged in that business at the time I made the
agreement with the Association. * * * I al-
ready had the Magnolia agency, and I did not
know that Capt. Boland owed them that amount,
and they said, if I would pay the $2,400 that
he owed them, I could take the agency. They
made me the proposition that, if I would as-
sume the payment of Capt. Boland's indebted-
ness of $2,400, they would give me the agency
for their beer. It was the understanding that,
instead of shipping the beer to Capt. Boland,
they would thereafter ship it to me. It was
the understanding that I would send in my
orders for such beer that I desired. If I want-
ed keg beer, I would send in my order for so
much keg beer; and if I wanted bottle beer,
I would send in my order for so much, and they
would not send any except what I ordered, and
when they would send that they would bill
it direct to me. The agreement as to how I
would pay for that beer was that they would
give me a car's credit on the start, and I was
to pay for the beer as the cars were sent
after that. Following that, the understanding
was that they were to draw a draft against
me with bill of lading attached for each ship-
ment of beer, and I was not to get that beer
until I paid for it, until I paid that draft.

Then, when I paid that draft, of course, the beer became mine, and I sold it. I got out in town and sold my own beer, and I sold it to whoever I pleased, for cash or credit, and how I pleased. That was the understanding. The agreement that was entered into between me and the American Brewing Association was, as alleged in this pleading here, that if I would accept the agency for the American Brewing Company's products in Orange county in such manner as to represent the interests of the defendant company, said agent purchasing direct the products of the defendant from the defendant company, and making sales thereof myself to the dealers, in Orange county, and said products to be invoiced to me by the defendant company at a price then and there agreed upon, and to be sold by me to the dealers thereof at a profit, and would pay to the defendant company for such business and agency said amount owing to it by its former agent, Mr. Boland, and amounting approximately to the sum of $2,400, the defendant company would exclusively contract with me for the conduct by me of their business in Orange, Tex., and appoint me its exclusive agent at said place, and would continue permanently to sell me, and no other person, except through me, goods of its manufacture or its products, thereby entitling me to the profits arising from the sale of said products, so long as the defendant conducted its business in Orange, Tex., or held or kept an agent at said place, all of which was consented to and agreed upon by the plaintiff, and said contract between the parties became mutual and binding. * * * It was agreed that I should pay them $7 per barrel for the beer, and, after I paid them for it, it became my property, and I sold it to whoever I pleased, on any terms I pleased. After I got back from Houston, after I made the deal with them, I did not make any arrangements of any kind with Capt. Boland for taking over his business. I had taken the car that was sent to him, and sold it to his customers. * * * The Association did not pay me any salary. The only profit I got out of the transaction was the difference between what I paid for the beer and what I sold it for. If I sold a bad account, that came out of my profit; and if I lost on the collections, I had to stand the loss. In my agreement to pay the $2,400 of Boland's account, I was induced to pay that or assume that amount by them agreeing to give me the exclusive purchase of their beer, and I could not have been induced to pay that indebtedness without them giving me the exclusive sale of their beer. I don't know exactly how long they had been selling beer to one person in Orange, but it was about ten or twelve years, or something like that. It was the understanding between us that this contract that we have been discussing would extend over several years' time. I couldn't hope to pay that $2,400 and make a profit unless I should continue that contract over four or five years. It was the understanding that it would extend a sufficient length of time after I had paid this amount that I would get back that money; that I would pay that Boland account out of the profits made in the sale of beer. It wasn't paid exactly out of that either. I had two more agencies; but I got the assurance that I could keep the agency long enough to pay it out of the sales of their beer alone, and it would take about three or four years at least to pay that Boland account. I maintain an office here, and rented a building. I keep one wagon and one horse. I owned the horse, and they sent me the wagon. I work one man and paid him a salary. About the latter part of January last, they began to sell beer to Mr. Seastrunk, and turned over a part of a car to him. I don't know exactly how long that car had been on the track here, that was sold to Mr. Seastrunk, but it was about a day or two, I guess. * * * The Houston Ice & Brewing Company agreed that they would not sell to anybody except me, and I had the same agreement with them that I had with the American Brewing Association, when I agreed to take that indebtedness over. * * * From the time that I made the contract for the exclusive agency and sale of beer with the American Brewing Association, up to the time that they canceled that agency, they sold to no other person except through me, and up to that time they complied with their agreement."

The witness being asked who paid the loss to the trade, if anybody, when he ordered beer to supply them when he was short, answered:

"I paid it myself, except to Mr. Futch, and he wouldn't take it. I lost a dollar profit, and he would not let me pay the freight. When I ordered beer in this way, I lost a dollar profit and 60 cents expressage. I made this loss each and every time that I failed to get the beer from the Association when the trade wanted it, whether it was through their fault or mine. I never at any time failed or refused, when short of beer, to try to get it as soon as possible."

There was testimony that the plaintiff, Woods, on his letter heads and otherwise, advertised as the agent of the defendant brewing company. There was also evidence that the brewing company, in correspondence with him, referred to him as its agent, and frequently complained that he did not take proper care of its customers.

[1] The defendant in error, Woods, here insists that the contract evidences the creation of an agency, and that, therefore, article 7798 of the Revised Statutes is not applicable. The legal effect of contracts similar to that here involved has frequently been before the courts of this state, and such contracts have been uniformly held to be contracts of sale, and not of agency. Fuqua v. Pabst Brewing Co., 90 Tex. 301, 38 S. W. 29, 750, 35 L. R. A. 241; Texas Brewing Co. v. Templeman, 90 Tex. 281, 38 S. W. 27; Texas Brewing Co. v. Anderson, 40 S. W. 737; Williams v. Drummond Tobacco Co., 17 Tex. Civ. App. 635, 44 S. W. 185; Segal v. McCall Co., 108 Tex. 55, 184 S. W. 188. The contract in question, as testified to by the defendant, is, under the authorities cited and many others in this state, a contract of sale, and not of agency. The fact that it was designated by the parties as a contract of agency does not control the provisions of the contract fixing its character as one of sale. The cases relied on by the defendant in error are

clearly distinguishable from the instant case.

Milburn Mfg. Co. v. Peak, 89 Tex. 209, 34 S. W. 102, was a case in which the manufacturing company furnished to Peak, as agent, certain vehicles for the purpose of sale. The contract provided that the title to the vehicles should not pass. In the opinion of the court, by Justice Denman, it is said:

"In the instrument before us the first party reserves (1) the absolute right to cancel the contract or to withdraw any of the 'jobs' at any time; (2) the ownership of the vehicles or their proceeds, all notes to be taken in their names and, together with all cash received, to be remitted to them, they to ascertain and set apart to second party their commission, which in the settlement provided for it was evidently contemplated should be offset against their liability on their guaranty of uncollected notes and other obligations in the contract assumed by them. Even as to vehicles unsold at the end of the year, the first party had the right to order the second party to store them free of charge, subject to the order of the first party."

In Welch v. Phelps & Bigelow Windmill Co., 89 Tex. 654, 36 S. W. 71, the contract as set out in the opinion of the Supreme Court was substantially as follows:

"The Phelps & Bigelow Windmill Company, of Kansas City, Mo., party of the first part, on the 22d day of May, 1890, entered into a contract with Welch and others, partners under the style of the Claude Lumber Company, of Claude, Tex., parties of the second part, wherein first party agreed (1) to give to the second party the exclusive right to sell during the year 1890 a certain patent of windmill, manufactured by first party, in certain named counties, but in no other; (2) 'to ship to party of second part from time to time such windmills as it may deem necessary for the proper conduct of the business herein undertaken by parties of second part;' and second party agreed (1) to thoroughly and fairly canvass said territory, to make all sales for cash, or so that the cash would at least be paid when the windmill was erected; to make weekly returns by mail to party of first part of all sales with names and addresses of purchasers, together with prices, no sale to be made below the price list attached to the contract, marked 'net price,' nor above the price list attached, marked 'selling price'; settlements to be made between the parties and 'remittances made to party of first part as called for by said settlements at least once per month, the basis of such settlements to be that party of first part is to receive for all goods sold the net price above mentioned, and all moneys beyond such amount and not in excess of the selling price is to belong to party of second part; (2) at their own cost, to do all necessary work in erecting windmills sold, to do the same in a workmanlike manner, and make all needed repairs in order to create public satisfaction and demand for such goods, and not to directly or indirectly be engaged in the sale of or keep in stock any other windmill goods during the existence of the contract; (3) to save party of first part harmless from all losses by way of suits and litigation of any kind emanating from their trade and business, and also as to freight charges on goods both ways between Kansas City, Mo., and Claude, Tex., including expenses that may be incurred to party of first part in looking up and gathering in its property that may be shipped to the parties of the second part under the contract, in the event of the termination of the contract and their neglect to properly perform said work; and that they will, at their own expense, reship to party of first part all windmill goods that may be on hand unsold at the termination of the contract in good order as received, or remit cash therefor according to the net price above mentioned.' It was further stipulated in said contract that 'the title and ownership of the windmill goods so to be shipped to the parties of second part shall still remain vested in the party of first part after such shipments, regardless of change of possession thereof, up to the time that same shall be sold to bona fide purchasers for purposes of erection upon their property within said territory,' and that party of first part had the right to terminate and revoke the contract at any time upon failure of the parties of the second part to faithfully comply with its terms, or any one of them."

We think the case of Wilcox & Gibbs Sewing Machine Co. v. Ewing, 141 U. S. 627, 12 Sup. Ct. 94, 35 L. Ed. 882, is clearly distinguishable in its facts from this case; but, if not, we are bound by the decisions of our own Supreme Court.

The facts here show an absolute agreement to sell. The vendor reserved no control over the property or its proceeds. There is no provision for a return of any property unsold. No control over the price or terms at which the vendee might sell is retained by the vendor. In fact, there is nothing in this contract to distinguish the transaction from the ordinary sale of personal property, to be paid for upon delivery. We therefore think that the contract here involved was a contract of sale, and not of agency.

[2] The remaining question is: Did the contract violate article 7798 of the Revised Statutes? Said section reads as follows:

"Either or any of the following acts shall constitute a conspiracy in restraint of trade:

"1. Where any two or more persons, firms, corporations or associations of persons, who are engaged in buying or selling any article of merchandise, produce or any commodity, enter into an agreement or understanding to refuse to buy from or sell to any other person, firm, corporation or association of persons, any article of merchandise, produce or commodity."

This statute clearly denounces as unlawful an agreement between any two or more persons, firms, corporations, or associations, who are engaged in buying or selling any article of merchandise, to refuse to sell to any other person any such article of merchandise, product, or commodity. This transaction falls literally within the language of the statute. The brewing company was engaged in the sale of beer, and Woods was engaged in both the purchase and sale of beer, and the effect

of the contract between them was that the brewing company should sell its products to Woods, and should refuse to sell to any other person at Orange. We are not concerned with the policy of the law. The courts must enforce it as written. To hold in this case that the contract is not in violation of law is to permit the law to be violated with impunity, by designating as an agency that which is in fact a sale.

We recommend that the judgment of the Court of Civil Appeals be reversed, and that the judgment of the trial court be affirmed.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.